## R. O. DE WITT, Appellant,
v.
## W. H. SORENSON, Appellee.
### No. 18514.

United States Court of Appeals
Fifth Circuit.
March 27, 1961.

Rehearing Denied June 2, 1961.
See 290 F.2d 562.

Louis H. Beard, Brown, Beard & Fulbright, Beaumont, Tex., for appellant.

James W. Mehaffy, Beaumont, Tex., Jack Voyles, Port Arthur, Tex., Keith Mehaffy, McNicholas & Weber, Beaumont, Tex., Robert Q. Keith, Beaumont, Tex., of counsel, for appellee.

Before TUTTLE, Chief Judge, HUTCHESON, Circuit Judge, and CLAYTON, District Judge.

CLAYTON, District Judge.

Both the appellant, Dr. R. O. DeWitt, who is a resident of Waynesville, Missouri, and the appellee, Dr. W. H. Sorenson, who is a resident of Port Arthur, Texas, are doctors of osteopathy. Before the appellant moved to Missouri, these two had professional associations in Jefferson County, Texas, and on a number of occasions, before the enterprise in question, they had invested money together in oil and gas ventures. Before this case, no dispute had ever arisen between the two and each had implicit trust in the other. This was the background of the series of events leading to this controversy.

Prospecting for oil and gas in the "Port Acres" area of Jefferson County, Texas, became keen in the fall of 1957.

While on a trip in October of 1957 the appellee, Sorenson, visited briefly at the home of appellant, DeWitt, and told him of the increased activity aforementioned. It was tentatively agreed then that if Sorenson made a venture there DeWitt would be invited to join with him. On his return home, appellee's concern with the development of this area increased, and he began actively to inquire as to the availability of interests therein which could be acquired. He learned of a 951.1 acre tract of land which could be leased at a $25 per acre annual delay rental, with a 20% royalty to be retained by the owners. The person giving this information to appellee also represented that the owners of this land were asking a bonus payment for the acquisition of a lease on these terms of $100 an acre and that he, because of friendship with the owners, could handle the negotiations and obtain the lease when others perhaps could not. As it later developed these last two representations were both false. Dr. Sorenson agreed with the person making them that they would both contact people interested in investing in the venture and that the party making these representations was to obtain the lease, arrange a satisfactory transfer to someone who would drill it and for his efforts would receive a $\frac{1}{32}$nd over-riding royalty.

On November 8, 1957, appellee, Sorenson, telephoned appellant, DeWitt, and talked to him about this venture. Both of the parties are in full accord about the agreement they made in this telephone conversation. Appellant agreed to purchase 100 acres at a price of $100 an acre, burdened with a 20% royalty retention by the landowners and a $\frac{1}{32}$nd over-riding royalty reserved to the one who acquired and serviced the lease. Appellee, Sorenson, assured his friend that he was investing dollar for dollar with him and was acquiring no greater interest for his money than was appellant, DeWitt. It was clearly understood that appellee, Sorenson, would have no interest in the over-riding royalty.

Shortly after that agreement between those parties for reasons not material here, appellee and the person with whom he had made the first agreement for the development of the venture terminated their relationship and appellee thereafter pursued its further development on his own. All participants, except appellee, Sorenson, the dates upon which they agreed to participate, the acres they agreed to purchase, and the amount of their investment are shown in Table I.[1]

The checks of all these participants were drawn payable to J. L. C. McFaddin, Trustee, who was acting for the owners, and all of these checks, except the check of appellant, DeWitt, and the check of Mason were in the hands of appellee by November 12, 1957. Appellant's check was received by him on November 15 or November 16; the check of Mason was received and all checks were on hand before November 18, 1957.

On November 12, 1957, (the date upon which the last named investor agreed to participate) appellee, Sorenson, deposited his $20,000 personal check with the First National Bank of Beaumont,

[1]

Table I.

| Participant | Date Agreed to Participate | Acres to be Purchased at $100 | Amount of Investment |
|---|---|---|---|
| 1. Mason | November 8 | 200 | $20,000 |
| 2. DeWitt | November 8 | 100 | 10,000 |
| 3. Shields | November 10 | 100 | 10,000 |
| 4. Lyons | November 10 | 50 | 5,000 |
| 5. Fuller | November 10 | 25 | 2,500 |
| 6. Pond | November 10 | 10 | 1,000 |
| 7. Morgan | November 12 | 86 | 8,600 |
| | | 571 | $57,100 |

at Beaumont, Texas, advising the president of the bank that in a few days leases would be escrowed through the bank and that this deposit would be applied toward payment of the purchase price thereof. On the following day, November 13, 1957, appellee, Sorenson, telephoned the trustee who was acting for the owners, reporting to him the status of the bonus money which he was obtaining and advising that he expected to receive the remainder of the money within a few days. It was during this conversation with Mr. McFaddin that Dr. Sorenson learned for the first time that the bonus which the owners would require to be paid was only $75 per acre rather than the $100 per acre which theretofore he had understood the bonus price to be.

Five days after appellee learned that the bonus payment to the owners was to be $75 per acre rather than $100 per acre, the three leases were drawn showing appellee, Sorenson, trustee, as the lessee therein. When J. L. C. McFaddin, trustee, who was acting for the owners was advised that the total consideration was in escrow with the First National Bank, these leases, covering a total of 951.1 acres, were signed, acknowledged and recorded. During these five days appellee, Sorenson, did not advise any of his participants that the bonus to be paid was $75 rather than $100 per acre. In closing this transaction, the appellee paid the entire $10,000 belonging to appellant to the trustee of the owners of the land and in fact used $14,275 which belonged to the seven other participants in this venture, to make the payment. No participant was told the facts about the bonus actually paid until January, 1958, and only one was told then.

After the leases were purchased, appellee, Sorenson, obtained two powers of attorney from each of the other participants authorizing him to handle the leases as attorney in fact, and although he corresponded with appellant, DeWitt,

sending to him at least five letters prior to May of 1958, he made no mention of the fact that the bonus paid for the leases was $75 per acre rather than $100.

Appellee refunded to some of the participants the overage of $25 per acre which they had paid into the venture, but he arranged for the sale, to another party, of a part of the acreage bought by one of these participants for $100 per acre without informing that participant of the actual bonus paid to the landowners.

In May of 1958, about six months after these leases were obtained, appellant, DeWitt, visited Port Arthur, Texas, and then learned, for the first time, that the bonus payment made to obtain the leases was in fact $75 instead of $100 an acre. There are two slightly differing versions of what was said between the parties, but it is clear that no firm understanding was concluded and no refund was paid or tendered to appellant. It was appellant's understanding then that he was getting additional acreage for his excess payment.

In September of 1958, appellee, Sorenson, transferred the leases[2] to Pan American Petroleum Corporation by two separate instruments, one dated September 12, 1958, and the other dated September 25, 1958. Consideration for this was the payment of $75 per acre by Pan American Petroleum Corporation and the reservation to appellee, Sorenson, as trustee, of an over-riding royalty interest of 16.875%. In the instrument dated September 12, 1958, there was provided for Dr. Sorenson, individually, an over-riding royalty interest equal to 3.125% of the production from the entire 951.1 acres to be paid only after Pan American Petroleum Corporation had received a total of $250,000 of production from the three leases. September 25, 1958, was the date upon which these transactions were completed and payment made to Dr. Sorenson of the cash consideration stated.

2. These leases had by then become very valuable and the whole field was "booming". But, this is immaterial in disposing of this case.

These arrangements with Pan American Petroleum Corporation were concluded by appellee, Sorenson, without consultation with, or advice from appellant, DeWitt, but when appellant was fully informed with respect thereto and clearly understood that appellee was claiming for himself all of the acreage of the three leases, in excess of the number which could have been bought for the other participants if the bonus payment to the landowners had been at the rate of $100 an acre, and that appellee was also claiming for himself personally the over-riding royalty interest provided in the document dated September 12, 1958, he then promptly filed this suit.

Briefly stated appellant contends 1) that since all of his $10,000 was used to pay the landowners for these leases he became the owner of 133⅓ acres of the leases and upon assignment to Pan American Petroleum Corporation he became entitled to the full benefits of such ownership, that is: payment to him of the bonus received by appellee as trustee under the document dated September 25, 1958, for 133⅓ acres of ownership, and royalty payments on the same basis, and 2) that he is entitled to his proportionate part (based on 133⅓ acres of ownership) of the over-riding royalty payable to appellee individually under the document of September 12, 1958.

Appellee contends that appellant is entitled to a refund of $2500 with interest, is the owner of only 100 acres of interest in these leases and is entitled only to the benefits flowing from such ownership.

These were the underlying issues upon which the case was tried in the District Court to a jury. Although, apparently, the District Judge recognized that there was little conflict in the evidence he submitted one special verdict question to the jury for answer. This was:

"Do you find from a preponderance of the evidence that at the time the lease in question was executed, Dr. W. H. Sorenson invested the entire Ten Thousand ($10,000) Dollars received from Dr. R. O. DeWitt for his, the said Dr. DeWitt's benefit by purchasing for him one hundred thirty-three and one-third (133⅓) undivided acres in the total acreage of nine hundred fifty-one and one-tenth (951.1) acres covered by the lease?

"Answer 'Yes' or 'No'."

By their verdict the jury answered "no" to this question and judgment was entered for appellee which wholly sustained his contentions.

Before trial on the merits appellant filed a motion for summary judgment; at the conclusion of all the evidence he filed a motion for judgment and after verdict he filed a motion for judgment non obstante veredicto. All of these were vigorously urged upon the consistent contention that there was no dispute with respect to any material fact and that these undisputed facts entitled appellant to judgment. These motions were all over-ruled.

The only differences, with respect to the facts, between these parties is with regard to what was said between them in May of 1958 at Port Arthur and what was said between them after the transfer of the leases to Pan American Petroleum Corporation. It is clear, however, that appellant, DeWitt, neither said nor did anything which could change his rights as they existed at the time when appellee, Sorenson, used $2,500 belonging to appellant toward payment for the purchase of the leases from the landowners. Hence, there is no dispute with respect to any material fact and the facts are with the appellant.

 All of the participants in this enterprise were engaged in a joint adventure and appellee occupied, with respect to each one of the other participants, a fiduciary relationship which required of him a high degree of fidelity, honesty and fair dealing. When he learned that these joint adventurers were going to be required to pay $75 an acre to the landowners for the acquisition of the lease, rather than $100 an acre which all had understood until that time the

purchase price to be, appellee, at a minimum, was required to report promptly this fact to all of the other participants, refunding at that time the excess of the investment made by each of them, or, acting otherwise as may then have been agreed. But, he elected to use the excess of the investment of appellant and that of the other participants as well (with which we are not here concerned) in paying the required bonus to the landowners. When he used this $2,500 of appellant for this purpose as a matter of law he bought for appellant additional acreage paid for with this money. Thus, at that time, appellant became and was the owner of 133⅓ acres in these three leases if he elected to so claim, as he did with the filing of this suit.

The law in most, if not all, of the states is in accord with these conclusions. Texas law clearly supports this view. In Finney v. Terrell, Tex.Civ.App.1925, 276 S.W. 340, 342, the Court stated:

"The subject of joint adventure is comparatively of modern origin. It was unknown at common law, being regarded as within the principle governing partnerships. And, while some jurisdictions hold that the joint adventure is not identical with partnership, it is everywhere regarded as of a similar nature and governed by the same rules of law. A distinction lies in the fact that a partnership is ordinarily formed for the transaction of a business of a particular kind and character, while joint adventure, as a generally accepted term, relates to the single transaction, although the latter may comprehend a business to be continued for a period of years. There is such a kinship and similarity in the principle that the distinction is remote."

See 25 Tex.Jur., Joint Adventurers, § 2; 30 Am.Jur., Joint Adventures, § 2; 48 C.J.S. Joint Adventures § 1(6).

Also in Thompson v. Duncan, Tex.Com. App.1932, 44 S.W.2d 904, 907, the Court said:

"Each of the parties engaged in this common enterprise in the nature of a joint adventure had the right to demand that his associates act with good faith in regard to all matters in connection with their common interest. Under such circumstances the parties bore a fiduciary relation to each other and were bound to the same degree of good faith in all the dealings of the common enterprise that is required in cases of partnership. (Citing cases.)

"The utmost good faith was required of defendant in error, who was the trustee in the conduct of the joint enterprise. He should not be permitted by reason of his possession of the property or the profits of the enterprise to obtain any unfair advantage of his coadventurers. (Citing cases.)"

In Whatley v. Cato Oil Co., Inc., Tex. Civ.App.1938, 115 S.W.2d 1205, 1209, the Court announced the following rule relative to the fiduciary relationship between joint adventurers:

"Where persons engage in a common enterprise by way of joint adventure, each has a right to demand and expect from his associates the utmost good faith in all that relates to their common interests. Within the scope of the enterprise they stand in a fiduciary relation each to the other, and are bound by the same standards of good conduct and square dealing as are required between partners. This obligation begins with the opening of the negotiations for the formation of the syndicate, applies to every phase of the business which is undertaken, and continues until the enterprise has been completely wound up and terminated. No member in promoting or carrying on the common enterprise can lawfully obtain for himself any secret profit or advantage therefrom, nor can he, without the consent of his associates, engage in any

individual operations harmful to the business in which he and his associates are engaged or acquire any interest in the property employed in the venture antagonistic to the interest which they have in it."

To the same effect are 2 Tex.Jur., Joint Adventurers, § 3; 48 C.J.S. Joint Adventures § 7(a) and 30 Am.Jur., Joint Adventures, § 49.

■ We would arrive at the same conclusion had we approached a solution along the route of either resulting or constructive trusts, each so vigorously urged by appellant. By reason of the joint adventure, the appellee was in a fiduciary position with respect to appellant. He misused this position for his own advantage and to the disadvantage of appellee. It cannot now be said that he is the owner of any of the acreage in these leases paid for with appellant's money. Mills v. Grey, 147 Tex. 33, 210 S.W.2d 985; San Antonio Loan & Trust Co. et al. v. Hamilton, 1955, 155 Tex. 52, 283 S.W.2d 19; 42 Tex.Jur., Trusts, § 36; 54 Am.Jur., Trusts, §§ 193, 218; 89 C.J.S. Trusts §§ 102, 139.

■ It is doubtless true that appellee, Sorenson, devoted a substantial amount of his time to the development of this project and the servicing of these leases which resulted ultimately in their transfer to Pan American Petroleum Corporation. It also appears that he was put to some expense in this regard. However, his contention that he can maintain, as against appellant, his claim for individual ownership of the 1/32nd overriding royalty is untenable. The law does not permit a partner to make a secret profit at the expense of his partners or to acquire any interest adverse to theirs. Nor will the law tolerate, in the circumstances here disclosed, a profit by the appellee (by his unilateral decision and action) derived from the fiduciary relationship which he occupied with respect to appellant. This would be so even though appellee had not made to appellant unequivocal representations that he,

appellant, had no interest in the overriding royalty which was to go to the person obtaining the leases and servicing their development for drilling. When the circumstances changed so that appellee considered it necessary for him personally to carry forward the work which was intended initially should be done by another, it was his obligation to report these facts to the other participants and to obtain from them their express authorization for him to do this work and receive the over-riding royalty therefor. This he did not do and thereby he lost his right to claim, as against appellant, individual ownership of the over-riding royalty specified in the document of September 12, 1958. Wilson v. Hunt, Tex.Civ.App.1925, 270 S.W. 263; Heilbron v. Stubblefield, Tex.Civ.App.1947, 203 S.W.2d 986; Butler v. Thomasson, Tex.Civ.App.1953, 256 S.W.2d 936; 32 Tex.Jur., Partnership, § 53; 68 C.J.S. Partnership § 94; 40 Am.Jur., Partnership, § 120.

Appellant is entitled to have his ownership in these leases established for 133⅓ acres thereof and is entitled to receive all of the benefits flowing from these several transactions to such ownership, including payment to him of his proportionate part of the bonus paid by Pan American Petroleum Corporation, with legal interest thereon from September 25, 1958, and his proportionate part of all of the royalties paid and to be paid by Pan American Petroleum Corporation to appellee as trustee and to appellee, individually, with interest at the legal rate, insofar as such royalty payments have been made heretofore, from the date of their several payments to appellee and until payment thereof is made to appellant. The fixing of appellant's ownership and of these amounts may best be done by the District Court. This cause is, therefore, reversed and remanded with directions for the entry of judgment for appellant and such additional orders as may be required to carry out the directions herein contained.

Reversed and remanded with directions.